Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| *IN RE:*<br><br>PERFORMANCE METRIC TARGETS FOR LUMA ENERGY SERVCO, LLC<br><br>LUMA ENERGY LLC, LUMA ENERGY SERVCO, LLC<br><br>Recurrentes<br><br>v.<br><br>NEGOCIADO DE ENERGÍA DE PUERTO RICO DE LA JUNTA REGLAMENTADORA DEL SERVICIO PÚBLICO, GOBIERNO DE PUERTO RICO<br><br>Recurrida | KLRA202400375 | Revisión Judicial Procedente del Negociado de Energía de Puerto Rico<br><br>Caso Núm.: NEPR-AP-2020-0025 |
| ***************************** | Consolidado con | Sobre:<br><br>Adjudicación de Propuesta sobre Métricas y Objetivos de Desempeño de LUMA Energy ServCo, LLC<br><br>************************ |
| IN RE:<br>PERFORMANCE METRIC TARGETS FOR LUMA ENERGY SERVCO, LLC<br><br>COMITÉ DIÁLOGO AMBIENTAL, INC.; EL PUENTE DE WILLIAMSBURG, INC. – ENLACE LATINO DE ACCIÓN CLIMÁTICA, INC.; ALIANZA COMUNITARIA AMBIENTALISTA DEL SURESTE, INC.; COALICIÓN DE ORGANIZACIONES ANTIINCINERACIÓN, INC.; AMIGOS DEL RÍO GUAYNABO, INC.; CAMBIO PR; SIERRA CLUB; UNIÓN DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO<br><br>Recurrente<br><br>v.<br><br>NEGOCIADO DE ENERGÍA DE PUERTO RICO<br>Recurrida | KLRA202400377 | Revisión Judicial Procedente del Negociado de Energía de Puerto Rico<br><br>Caso Núm.: NEPR-AP-2020-0025<br><br>Sobre:<br>Impugnación y revisión judicial de las Resoluciones y Órdenes del 26 de enero y 14 de junio de 2024 del Negociado de Energía de Puerto Rico sobre el establecimiento de mecanismo de incentivos y penalidades basado en desempeño a LUMA Energy |

Número Identificador

SEN2024 _____

Panel integrado por su presidente el Juez Bonilla Ortiz, la Jueza Mateu Meléndez y la Jueza Prats Palerm.[1]

Mateu Meléndez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 8 de noviembre de 2024.

El 15 de julio de 2024, LUMA Energy, LLC y LUMA Enery ServCo, LLC. (en adelante de forma conjunta LUMA) instó *Solicitud de Revisión de Decisión Administrativa de LUMA Energy, LLC y LUMA Energy ServCo, LLC.* Allí, nos solicitó la revocación del "*Final Resolution and Order on Performance Targets for LUMA Energy LLC and LUMA Energy ServCo, LLC,* emitida el 26 de enero de 2024 por el Negociado de Energía de Puerto Rico (en adelante, NEPR o el Negociado). Este recurso, fue identificado alfanuméricamente **KLRA202400375**.

En esa misma fecha, el Comité Diálogo Ambiental, Inc., El Puente de Williamsburg, Inc.- Enlace Latino de Acción Climática, Inc., Alianza Comunitaria Ambientalista del Sureste, Inc., Sierra Club Puerto Rico, Inc. y la Unión de Trabajadores de la Industria Eléctrica y Riego (en adelante, LECO, según identificada por el NEPR en el caso) presentaron el *Recurso de Revisión Judicial* número **KLRA202400377**. A través de este, también recurren en revisión de la determinación administrativa aludida en el párrafo anterior.

El 16 de agosto de 2024, notificada el 21, ordenamos la consolidación de ambos recursos. Contamos con el beneficio de la comparecencia de todas las partes, por lo que a continuación resolvemos.

**-I-**

El 22 de junio de 2020, y en virtud de la aprobación de la Ley para Transformar el Sistema Eléctrico de Puerto Rico (Ley 120-2018), según enmendada, la Autoridad de Energía Eléctrica, la Autoridad de Alianza

---

[1] Mediante OATA-2024-090 del 13 de agosto de 2024 se modificó la integración del Panel.

Público Privadas (en adelante, APP) y LUMA suscribieron el *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (en adelante, el Contrato). En lo pertinente a la controversia que hoy tenemos que atender, es importante saber que, como parte de los acuerdos, las partes establecieron que LUMA tendría derecho a devengar el pago de incentivos si cumplía o excedía las métricas de desempeño propuestas en el Anexo IX del acuerdo.

De otro lado, el 23 de diciembre de 2020, el NEPR emitió *Resolution and Order* con el fin de comenzar el proceso para establecer la base, las metas y los puntos de referencia de cumplimientos mínimos con los que el sistema eléctrico de Puerto Rico debía cumplir. Durante el proceso, se emitieron varios requerimientos de información dirigidos a LUMA. También se celebró una vista evidenciaria.[2] Como consecuencia del trámite administrativo, el 26 de enero del año en curso, el NEPR emitió la resolución recurrida. Allí, aceptó muchas de las propuestas hechas por LUMA. Sin embargo, realizó algunas modificaciones a algunos de los parámetros sobre incentivos, así como añadió otros.

El 15 de febrero de 2024, LUMA solicitó la reconsideración del *Final Resolution and Order*. Al hacerlo, argumentó que las modificaciones y adiciones realizadas por el NEPR eran arbitrarias, fuera de la autoridad concedida por ley y constituían interferencia inadecuada con los acuerdos alcanzados por la AEE, LUMA y la APP. Particularmente, expuso que la determinación emitida por el Negociado afectaba la capacidad de LUMA para ganar el incentivo contractual, la misma no se respalda con el expediente administrativo y menoscabó el debido proceso de ley.

Ese mismo día, LECO también solicitó reconsideración de la resolución emitida por el NEPR. En su escrito, cuestionó la negativa del

---

[2] Dentro de los trámites del caso, es importante notar que se autorizó la intervención de la OIPC y LECO, quienes participaron activamente del mismo.

NEPR de imponer penalidades por pobre desempeño. De igual forma, reclamó que debía reconsiderar las métricas modificadas sobre incentivos relacionados al desempeño presupuestario (*Budget performance metrics*), así como aquellas sobre el manejo de vegetación. Por último, pidió al NEPR que reconsiderara su determinación de excluir las quejas informales (*informal complaint*) de la métrica sobre atención al cliente. Habiéndose anunciado por parte de LUMA su intención de replicar este escrito, el 26 de febrero de este año, el NEPR dictó una resolución y orden en la que determinó acoger las reconsideraciones sometidas y concedió plazo a LUMA para replicar y a LECO para someter su dúplica.

El 8 de mayo de 2024, el NEPR extendió por treinta (30) días el término para resolver las reconsideraciones sometidas. Posteriormente, el **14 de junio de 2024**, dictó una Resolución y Orden (*Resolution and Order*). En esta, concluyó que los argumentos levantados por LECO en su reconsideración no aportaban información nueva que no hubiera estado disponible al momento de emitirse la decisión. Igualmente, determinó que sus planteamientos tampoco demostraban que la Junta hubiera actuado sin autoridad en ley, de forma ilegal, irrazonable o arbitraria. En consecuencia, denegó su reconsideración.

Por su parte, al atender la reconsideración sometida por LUMA, el NEPR en primer lugar, negó haber actuado sin autoridad y fuera del poder que le fue delegado en virtud de su ley orgánica. En contrario, aclaró que no tenía que adherirse a las métricas ilustrativas de LUMA del Contrato, del cual señaló no es parte. Sobre esto último, específicamente señaló que el propio documento establece que las métricas allí indicadas eran ilustrativas. Entiéndase pues, que las mismas pueden ser sujetas a las revisiones, discusiones y modificaciones necesarias para alinearla con el marco regulador y las necesidades específicas de energía de Puerto Rico. Por tanto, el NEPR expresó que el Contrato no podía impedir o restringir

sus poderes, ni su jurisdicción y autoridad en cuanto a todo asunto sobre el cual por disposición de ley tiene inherencia. Así declarado, el NEPR atendió cada uno de los cuestionamientos levantados por LUMA. Al hacerlo, reiteró su autoridad para realizar las modificaciones efectuadas. A continuación, reevaluó su posición y determinó que las preocupaciones que le llevaron a reducir las métricas de desempeño a solo tres escalas podían ser atendidas mediante un enfoque linear estandarizado, por lo que concedió la petición de reconsideración de LUMA sobre este asunto, reinstalándolas a 5 escalas. No obstante, rechazó reconsiderar las modificaciones realizadas, reafirmándose en su autoridad para efectuarlas.

A los fines de atender una de las controversias levantadas, precisamos destacar que la Resolución y Orden que atendió la reconsideración no contuvo lenguaje alguno relativo a reconsideración y/o revisión judicial. Dada la ausencia del lenguaje mencionado, el 28 de junio de 2024, LUMA solicitó al NEPR que enmendara su dictamen del 14 de junio a los fines de incluir un aviso concerniente a la revisión judicial. En respuesta a este escrito, el 10 de julio de 2024, el NEPR negó la enmienda solicitada y señaló que el dictamen emitido el 14 de junio de 2024, contenía las advertencias referentes a la reconsideración, la revisión judicial y los plazos aplicables a cada una de estas herramientas, por lo que LUMA fue adecuadamente informada del término con el que cuenta para acudir en revisión judicial en el caso.[3]

Así las cosas, el 15 de julio del año en curso LUMA y LECO sometieron sus respectivos recursos de revisión judicial en los que, por las razones en cada uno de estos dadas, afirman que procede revocar o modificar el dictamen recurrido. En el recurso **KLRA202400375**, a modo de primer señalamiento de error, LUMA asevera que la determinación final emitida en el caso se dictó en violación a las garantías básicas del debido

---

[3] Véase, pág. 7629 del Apéndice del recurso KLRA202400375.

proceso de ley. Arguye, también, que la misma no está apoyada en evidencia sustancial que obre en el récord administrativo, por lo que es arbitraria. De otra parte, y como segundo error señalado, indica que el NEPR excedió los parámetros de su autoridad al modificar la estructura de incentivos fijada en el contrato e interfirió con sus derechos y expectativas contractuales. De igual forma, reclama que la determinación final menoscabó inconstitucionalmente sus derechos contractuales.

Por su lado, en el recurso **KLRA202400377**, como primer señalamiento de error LECO reclama que mediante la resolución emitida el 14 de junio de 2024, el NEPR violentó el derecho de las partes a recibir una notificación adecuada del derecho que tienen a la revisión judicial. De otra parte, como el segundo de sus errores, le atribuye al NEPR equivocarse al no establecer un mecanismo de incentivos que estuviera acompañado de penalidades.

Atendidos ambos recursos, habiéndose consolidados estos y luego de varios trámites que no son necesarios detallar, las partes han comparecido y expuesto sus respectivas posiciones.[4] Damos por perfeccionado el recurso y procedemos a atender las controversias señaladas.

-II-

*A.*

Es norma hartamente conocida y reiterada en nuestro ordenamiento jurídico que los foros apelativos deben conceder amplia deferencia a las decisiones administrativas debido a la experiencia y pericia que estos

---

[4] El 3 de septiembre de 2024, LECO presentó su *Alegato en Oposición al Recurso de Revisión Judicial*. Ese mismo día, solicitó autorización para excederse del límite de 25 páginas reglamentario. Hoy, autorizamos la presentación de su escrito en exceso del número establecido en nuestro Reglamento. Igual determinación favorable alcanzamos sobre: (1) la solicitud para someter escrito en exceso de páginas que LUMA presentó en esa misma fecha junto a su *Alegato de LUMA en Oposición a Recurso de Revisión Judicial* y su *Solicitud de Autorización para Presentar Documentos Contenidos en el Apéndice Suplementario en Formato Nativo*; (2) la *Moción Solicitando Autorización para Exceder Límite de Páginas* que el NEPR presentó el 27 de septiembre de 2024.

organismos, presumiblemente tienen respecto a las facultades que se les han delegado. Otero Rivera v. Bella Retail Group, Inc., 2024 TSPR 70, 213 DPR ____, al citar a Graciani Rodríguez v. Garage Isla Verde, 202 DPR 117, 126 (2019) y Rolón Martínez v. Supte. Policía, 201 DPR 26, 35 (2018).[5]

La competencia de este Tribunal de Apelaciones para revisar las actuaciones administrativas está contemplada en la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), Ley 38-2017, 3 LPRA Sec. 9601, *et seq*. A tales efectos, la Sección 4.1 de la LPAU dispone sobre la revisión judicial que las disposiciones de dicha ley serán aplicables a aquellas órdenes, resoluciones y providencias adjudicativas finales dictadas por agencias, las que serán revisadas por el Tribunal de Apelaciones mediante Recurso de Revisión.[6] Por su parte, la Sección 4.2 de la LPAU establece que la parte adversamente afectada por una orden o resolución final de una agencia y que haya agotado todos los remedios provistos por la agencia o por el organismo administrativo apelativo correspondiente podrá presentar una solicitud de revisión dentro de treinta (30) días contados a partir de la fecha de archivo en autos de la notificación de la orden o resolución final.[7]

La revisión judicial permite a los tribunales garantizar que las agencias administrativas actúen dentro de los márgenes de las facultades que le fueron delegadas por ley. Capote Rivera v. Voili Voila Corporation, 2024 TSPR 29, 213 DPR ____, al citar a Comisión Ciudadanos v. G.P. Real Property, 173 DPR 998, 1015 (2008). Al ejercer la revisión judicial, los tribunales no pueden descartar de forma absoluta la determinación de una

---

[5] Reconocemos que recientemente el Tribunal Supremo Federal emitió una decisión en la que cuestionó gran parte de la jurisprudencia que dirige el proceso de revisión judicial que efectúan los tribunales sobre las decisiones administrativas. Particularmente, en cuanto a la deferencia que estas merecen al interpretar un estatuto ambiguo. Véase Loper Bright Enterprises et al., v. Raimondo, 603 US ____ (2024), 144 S. Ct. 2444. No obstante, es nuestro parecer que las circunstancias particulares del caso ante nuestra consideración no requieren que profundicemos sobre los fundamentos consignados en la mencionada decisión.

[6] 3 LPRA Sec. 9671

[7] 3 LPRA Sec. 9672.

agencia, sino que primero tienen que examinar la totalidad del expediente y determinar si la interpretación de la agencia representó un ejercicio razonable de su discreción administrativa, así fundamentado en la pericia particular de esta, en consideraciones de política pública o en la apreciación de la prueba. *Íd.,* al citar a Otero v. Toyota, 163 DPR 716, 729 (2005). Ello así, puesto a que las determinaciones de los organismos administrativos están revestidas de una presunción de regularidad y corrección por su vasta experiencia y conocimiento especializado y, conforme ya citamos, merecen deferencia por parte de los foros judiciales. *Íd.*

Ahora, la deferencia antes mencionada no es absoluta. Capote Rivera v. Voili Voila Corporation, *supra.* Así pues, los tribunales no pueden, bajo el pretexto de deferencia a las determinaciones administrativas, imprimirle un sello de corrección a aquellas interpretaciones administrativas que sean irrazonables, ilegales o contrarias a derecho. *Íd.,* al mencionar a Graciani Rodríguez v. Garage Isla Verde, *supra* a la pág. 127. Por ello, la deferencia a las decisiones administrativas debe ceder cuando: (1) la decisión no está basada en evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o reglamentos;(3) ha mediado una actuación arbitraria, irrazonable o ilegal, o (4) la actuación administrativa lesiona derechos constitucionales fundamentales. Super Asphalt v. AFI y otro, 206 DPR 803, 819 (2021).

*B.*

Al considerar que resultaba indispensable y urgente establecer una reforma abarcadora del sector eléctrico de Puerto Rico que fomente la operación y administración de un sistema "eficiente y de costos justos y razonables" la Asamblea Legislativa de Puerto Rico aprobó la Ley 57-2014. Con ese, y otros propósitos, a través del mencionado estatuto, entre otras cosas, se creó lo que hoy día se conoce como el Negociado de Energía o

NEPR. Conforme el Art. 6.3 de la discutida ley estatuto, los poderes y deberes del Negociado son:

(a) Fiscalizar y asegurar la cabal ejecución e implementación de la política pública sobre el servicio eléctrico en Puerto Rico;

(b) Establecer mediante reglamento las normas de política pública en relación con las compañías de servicio eléctrico, así como toda transacción, acción u omisión que incida sobre la red eléctrica y la infraestructura eléctrica en Puerto Rico, e implementar dichas normas de política pública. Estos reglamentos deberán ser cónsonos con la política pública energética declarada por vía de legislación;

(c) Establecer e implementar los reglamentos y las acciones regulatorias necesarias para garantizar la capacidad, confiabilidad, seguridad, eficiencia y razonabilidad en tarifas del sistema eléctrico de Puerto Rico y establecer las guías, estándares, prácticas y procesos a seguir para los procesos para la compra de energía, la modernización de plantas o instalaciones generadoras de energía, disponiéndose que todo contrato de compraventa de energía deberá cumplir con los estándares, términos y condiciones establecidos por el NEPR de conformidad con lo dispuesto en la Ley de Política Pública Energética y esta Ley.

**(d) Fiscalizar la calidad, eficiencia y confiabilidad del servicio eléctrico provisto por cualquier compañía de energía certificada en Puerto Rico para garantizar una red robusta que atienda las necesidades de la isla;**

[…]

Formular e implementar estrategias para lograr los objetivos de esta Ley, incluyendo, pero sin limitarse a, lograr la meta de reducir y estabilizar los costos energéticos permanentemente, controlar la volatilidad del precio de la electricidad en Puerto Rico, el establecimiento de programas de respuesta a la demanda, los estándares de la Cartera de Energía Renovable y eficiencia energética, promover el almacenamiento de energía e integración de generación distribuida, entre otros. En el ejercicio de sus poderes y facultades, el Negociado de Energía, requerirá que los precios en todo contrato de compraventa de energía, toda tarifa de trasbordo y todo cargo de interconexión eléctrica sean justos y razonables, cónsonos con el interés público y cumplan con los parámetros que establezca el Negociado vía reglamento;

[…]

**(i) Establecer mecanismos y programas de eficiencia energética para alcanzar progresivamente metas razonables que aseguren el cumplimiento con la política pública energética;**

**(j) Instaurar mecanismos de incentivos y penalidades basados en desempeño.** (énfasis nuestro)

De otra parte, el Artículo 6.4 de la Ley Núm. 57-2014, le otorgó al NEPR jurisdicción primaria exclusiva sobre lo siguientes asuntos:

1) La aprobación de las tarifas y cargos que cobren las compañías de energía o un productor independiente de energía en relación con cualquier servicio eléctrico, al amparo de lo dispuesto en el Artículo 6.25 de esta Ley, así como los casos y controversias relacionadas con las tarifas que cobren las compañías de energía a sus clientes residenciales, comerciales o industriales, y sobre los casos y controversias relacionadas con las tarifas y cargos de cualquier productor independiente de energía.

2) Los casos y controversias relacionadas con la revisión de facturación de las compañías de energía a sus clientes por los servicios de energía eléctrica.

3) Los casos y controversias en las que se plantee el incumplimiento con la política pública energética del Gobierno de Puerto Rico según expresada en la "Ley de Política Pública Energética de Puerto Rico" y el derecho vigente.

4) Los casos y controversias en las que se plantee el incumplimiento con cualquiera de los mandatos establecidos en las secs. 191 a 217 de este título, conocidas como la "Ley de la Autoridad de Energía Eléctrica "y con cualquiera de los mandatos establecidos en la "Ley de Política Pública Energética de Puerto Rico", en relación con el servicio eléctrico o en relación con asuntos energéticos.

5) Los casos y controversias sobre trasbordo de energía eléctrica o interconexión con la red de transmisión y distribución, y toda persona que esté, o interese estar, conectada a la red de energía eléctrica en Puerto Rico o toda persona con un interés directo o indirecto en esos servicios de energía eléctrica.

6) Los casos y controversias que surjan en relación con contratos entre la Autoridad, su sucesora, o el contratante de la red de transmisión y distribución, los productores independientes de energía y las compañías de energía, así como sobre los casos y controversias entre productores independientes de energía. Esto incluirá, pero no se limitará, a los contratos de compraventa de energía mediante los cuales un productor independiente de energía se disponga a proveer energía a una compañía de energía para ser distribuida, y a los casos en que se cuestione la razonabilidad de los términos y condiciones de un contrato de compra de energía.[8]

De igual forma, el Artículo 6.4 de la Ley 57-2014, le reconoce al NEPR

jurisdicción **general** sobre:

1) […] regulatoria investigativa y adjudicativa sobre la Autoridad y cualquier otra compañía de energía certificada que rinda servicios dentro del Gobierno de Puerto Rico.

2) Cualquier persona natural o jurídica que viole las disposiciones de esta Ley en materia de energía eléctrica o los reglamentos del Negociado, incluyendo a cualquier persona natural o jurídica, o entidad que utilice su control sobre los servicios de energía eléctrica para llevar a cabo tal violación.

3) Cualquier persona natural o jurídica cuyas acciones afecten la prestación de servicios de energía eléctrica, incluyendo a

---

[8] 22 LPRA Sec. 1054c.

cualquier persona o entidad que utilice su control sobre dichos servicios para afectar la prestación de los mismos.

4) Cualquier persona natural o jurídica que lleve a cabo cualquier actividad para la cual sea necesaria una certificación, autorización o endoso del Negociado de Energía.

5) Cualquier persona natural o jurídica cuyas acciones u omisiones resulten en perjuicio de las actividades, recursos o intereses sobre los cuales el Negociado posee poderes de reglamentación, investigación, adjudicación o fiscalización, incluyendo cualquier persona que utilice su control sobre servicios de energía eléctrica de tal manera que resulte en dicho perjuicio.

Por su parte, la Ley 17-2019, *Ley de Política Pública Energética de Puerto Rico*, declara como política pública, entre otras, el establecer un Modelo de Servicio Eléctrico que cumpla entre muchas cosas, con promover los cambios necesarios para transformar al Sistema Eléctrico de Puerto Rico a uno que responda a sus necesidades energéticas en el Siglo XXI; establecer un modelo de Sistema Eléctrico en el que se maximice el aprovechamiento de los recursos energéticos disponibles y se empodere al consumidor a que forme parte de la cartera de recursos energéticos mediante la adopción de estrategias de eficiencia energética, respuesta a la demanda, la instalación de generadores distribuidos, entre otras; y diseñar una red eléctrica que contemple el desarrollo e integración de comunidades solares, el trasbordo de energía y la creación de microrredes, cooperativas eléctricas o cooperativas de energía como alternativas y herramientas para aumentar el acceso a energía renovable, y para contribuir a su resiliencia ante desastres naturales.[9]

Además de lo antes señalado, y como parte de las declaraciones de política pública energética, la Ley 17-2019 establece que el NEPR:

a. será la entidad independiente encargada de regular el mercado de energía en Puerto Rico, contando con amplios poderes y deberes, así como con los recursos financieros y técnicos y el personal capacitado necesario para asegurar el cumplimiento con la política pública energética, las disposiciones y mandatos de la Ley 17-2019, y para asegurar costos justos y razonables, asequibles, fácil de comprender y claramente comparables y transparentes mediante la fiscalización y revisión de las tarifas;

---

[9] 22 LPRA sec. 1141d (2)(a)(e)(f).

b. deberá ejercer un alto escrutinio sobre el mantenimiento de la red eléctrica y requerir informes periódicos que describan el estado del mantenimiento de la red eléctrica, así como los planes elaborados para satisfacer dichas necesidades;

c. deberá utilizar, cuando así se amerite, mecanismos alternos a la regulación tarifaria a base de los costos del servicio (*"cost-based regulation"*) para el cumplimiento y la implementación de las métricas y los objetivos establecidos en esta Ley; y

d. **cuando así lo estime apropiado, en los procesos de regulación tarifaria establecerá mecanismos de incentivos y penalización basados en métricas de desempeño a las compañías de servicio eléctrico y de cumplimiento fiel con sus órdenes.**

*C.*

A los fines de cumplir con las funciones y deberes designadas por las antes discutidas leyes, el 13 de diciembre de 2019, el NEPR aprobó el *Reglamento de Mecanismos de Incentivos Basados en Desempeño* (Reglamento 9137). Allí, estableció los requisitos de reporte para todas las compañías de servicio eléctrico elegibles y describe el proceso mediante el cual se establecerán las métricas, objetivos e incentivos financieros.[10]

El Artículo 7 del Reglamento 9137 regula lo concerniente al proceso para establecer mecanismos de incentivo basados en desempeño. A tales efectos, esta dispone como a continuación se transcribe:

**Sección 7.1.- Principios para Establecer Mecanismos de Incentivo basados en Desempeño:**

El negociado de Energía aplicará estos principios para establecer Mecanismos de Incentivos basados en Desempeño

A) Las metas de política del Negociado de Energía y los resultados deseados, incluyendo pero sin limitarse a:

---

[10] Conforme define el Reglamento 9137:
- *Compañía de Servicio Eléctrico o Compañía*, se refiere a "cualquier Persona, dedicada a la prestación de servicios de generación de energía eléctrica, transmisión y distribución, facturación, trasbordo, servicios de red, almacenamiento de energía, reventa de energía eléctrica y cualquier otro servicio de energía según definido por el Negociado de Energía en el Reglamento 801."
- *Incentivo Financiero* se define como la recompensa o penalización económica que puede ser vinculada a un Objetivo y que, de ser vinculada, se aplica a una Compañía de Servicio Eléctrico determinada, por cumplir o no con dicho Objetivo. El Incentivo Financiero se expresará como un honorario de incentivo pagado en dólares estadounidenses nominales.
- *Métrica*, se refiere a un indicador cuantificable que puede ser utilizado y rastreado a lo largo del tiempo evaluar el desempeño de una entidad.
- *Mecanismo de Incentivo basado en el Desempeño* es cualquier métrica, objetivo o incentivo financiero establecido para inducir a compañías a mejorar su desempeño.
- *Objetivo* es la meta que puede estar asociada a una métrica y contra la cual, de estar asociada, se evaluará el desempeño de una Compañía.

1. La volatilidad y asequibilidad de las tarifas del servicio de energía eléctrica;

2. Los incentivos económicos y el retorno de la inversión;

3. La confiabilidad del servicio de energía eléctrica;

4. Servicio al cliente y compromiso, incluyendo opciones para administrar los costos de energía eléctrica disponibles para los clientes;

5. Acceso de los clientes a los sistemas de información de las Compañías de Servicio Eléctrico, incluyendo entre otros, el acceso público a la información sobre el consumo agregado de los clientes y el acceso de los consumidores individuales a la información sobre su consumo de energía;

6. Cumplimiento con Métricas para alcanzar los estándares de eficiencia energética establecidos en la Ley 17-2019.

7. Cumplimiento con la Cartera de Energía Renovable e integración rápida de las fuentes de energía renovables, incluyendo la calidad de la interconexión de los recursos ubicados en las propiedades de los consumidores.

8. Mantenimiento de la infraestructura;

9. Cumplimiento con las políticas ambientales federales y locales, según corresponda; y

10. Otros objetivos de política pública pertinentes establecidos por el Negociado de Energía.

B) Los mecanismos de Incentivo basados en Desempeño deberán inducir un comportamiento consistente con la política pública, que de otra forma no ocurriría a un grado suficiente en la ausencia de Mecanismos de Incentivo basados en Desempeño.

C) Los Mecanismos de Incentivo basados en Desempeño deberán ser definidos de forma clara, y ser interpretados y verificados fácilmente.

D) Los Mecanismos de Incentivo basados en Desempeño deberán enfocarse en áreas dentro de un control razonable de las Compañías afectadas.

E) Los Mecanismos de Incentivo basados en Desempeño deberán ser diseñados para maximizar los beneficios netos para los consumidores. Donde los beneficios y costos sean cuantificables, los beneficios netos deben ser mayores que los pagos de Incentivos Financieros.

F) Los Mecanismos de Incentivo basados en Desempeño deberán proveer a la Compañía afectada ningún incentivo financiero adicional al necesario para alinear su desempeño con el interés público.

G) Los mecanismos de Incentivo basados en Desempeño deben complementar incentivos financieros existentes para cada Compañía afectada, sin que la Compañía sea compensada en exceso, o no compensada debidamente, por alcanzar los objetivos deseados.

**Sección 7.2.- Establecimiento de Incentivos y Penalidades**

A) Con respecto a la Autoridad, el Negociado de Energía aplicará solamente Métricas y Objetivos, hasta el momento en que haya una compañía sucesora con fines de lucro operando como el concesionario de transmisión y distribución por medio de un contrato con la Autoridad, y luego el Negociado de Energía podrá aplicar Incentivos Financieros al sucesor.

B) A discreción del Negociado de Energía, los Incentivos Financieros serán aplicados de la siguiente manera:

   1) Incentivos Financieros para compañías con fines de lucro sujetas a la regulación de tarifas por el Negociado de energía, serán establecidos de forma individual, por caso, para las Métricas que el Negociado de Energía determine que están sujetas a Incentivos Financieros y deben ser pagadas como una comisión de incentivo.

   2) Para todas las compañías con fines de lucro reguladas por el Negociado de Energía, el Negociado podrá poner penalidades por incumplimiento de acuerdo con su autoridad conforme a la Sección 6.36 de la Ley 57-2014.

**Sección 7.3.- Compañías de Servicio Eléctrico**.

A) Autoridad

   1) El Negociado de Energía establecerá por Orden, las Métricas, Objetivos e Incentivos Financieros a ser aplicados a la Autoridad y/o su sucesor, con relación a sus áreas principales de responsabilidad. Las áreas de desempeño sujetas a Métricas, Objetivos e Incentivos Financieros podrán incluir, sin limitarse a:

      a) Servicio al Cliente;

      b) Desempeño financiero;

      c) Desempeño en generación;

      d) Gerencia y Operaciones;

      e) Regulatoria;

      f) Confiabilidad y Resiliencia;

      g) Desempeño del sistema; y

      h) Seguridad del personal.

   2) Cada Incentivo Financiero deberá ser diseñado de acuerdo con los principios establecidos en la Sección 7.2, y podrán incluir, por ejemplo pero sin limitarse a, uno o más de los siguientes elementos de diseño;

      a) Una recompensa;

      b) Una penalidad;

      c) Un nivel de desempeño mínimo, debajo del cual no se recibirá recompensa;

d) Un nivel de desempeño objetivo que indica la meta de desempeño deseada;

e) Un nivel de desempeño máximo, sobre el cual no se recibirá recompensa;

f) Recompensa y penalidades simétricas, por el cual el desempeño por encima de un nivel objetivo es recompensado con una cantidad reflejada en una penalidad por el desempeño a un nivel comparable por debajo del nivel objetivo;

g) Recompensas y penalidades asimétricas, por el cual el desempeño por encima de un nivel objetivo es recompensado con una cantidad no reflejada en una penalidad por el desempeño a un nivel comparable por debajo del nivel objetivo. Algunos incentivos Financieros pueden proveer penalidades sin ninguna recompensa y viceversa;

h) Una zona que refleje el rango sobre y debajo del nivel objetivo de desempeño, dentro del cual no se recibirá ninguna penalidad ni recompensa; y

[…]

-III-

En los distintos argumentos levantados, por diferentes razones, LUMA en el recurso **KLRA202400375** y LECO en el **KLRA202400377**, impugnan la Resolución y Orden Final emitida por el NEPR en el caso de epígrafe. LUMA, cuestiona las modificaciones efectuadas por el Negociado a la estructura de incentivos, mientras que LECO impugna el que no se hayan establecido penalidades contra LUMA.

Atenderemos en orden de presentación los recursos. Por tanto, primero adjudicamos las controversias levantadas por LUMA en su recurso de revisión judicial **KLRA202400375.** Allí, en su primer señalamiento de error, LUMA reclama que la determinación administrativa dictada violentó las garantías del debido proceso de ley, puesto que no tiene apoyo en evidencia sustancial del récord administrativo. Sobre esto, en resumidas cuentas, arguyó que la decisión se basó en prueba ajena al expediente, debido a que:

(1) el Negociado consideró documentos e información extraña al caso y hasta cierto grado sorpresiva, pese a que LUMA solicitó oportunamente durante el proceso administrativo al NEPR que

(2) el NEPR actualizó las referencias base con datos referentes a años fiscales distintos a los que se estableció debían utilizarse, erradamente tomando conocimiento oficial de la información de estos años y modificando con la misma varias métricas;

(3) la modificación del enfoque para medir los objetivos de desempeño y los objetivos anuales de desempeño se hizo utilizándose dos metodologías diferentes a propuestas por LUMA;

(4) la adopción de objetivos de desempeño diferentes y más agresivos a los propuestos por LUMA, y los cambios hechos por el NEPR a la estructura de niveles ("tiers"), a los puntos base que asignó en el Anexo IX Revisado y a las métricas de *Customer Service y Technical, Safety and Regulatory* no tienen señalado la evidencia del expediente en la cual se basó el Negociado para su análisis y es contraria a aquellas propuestas únicamente por LUMA durante el proceso.

Ante cada una de estas actuaciones señaladas, LUMA reclama también haber sido privada de una notificación adecuada, así como que se le violentó su derecho a presentar prueba y contrainterrogar testigos. Por todo ello, en la discusión de su primer señalamiento de error, clasifica de imparcial, arbitraria y caprichosa la determinación final emitida por el NEPR.

De otra parte, al discutir su segundo error LUMA sostiene que el NEPR excedió la autoridad que por ley tiene al modificar el esquema de incentivos establecido en el Contrato. Particularmente, al refutar las determinaciones del cuerpo administrativo sobre la extensión de su poder, LUMA señala que el análisis del Negociado ignora las disposiciones contenidas en la Sección 3 y Sección 8(d) de la Ley Núm. 120-2018.

Según LUMA, tales disposiciones establecen que el NEPR no puede alterar o enmendar un acuerdo como el Contrato, ni interferir con asuntos operaciones o contractuales. A su vez, afirma que el proceder del Negociado es contrario a sus propias actuaciones, puesto que mediante resolución anterior había certificado que el Contrato cumplía con las leyes y políticas públicas relevantes y aplicables. Aunque reconoce la autoridad del NEPR para adoptar mecanismos de incentivos basados en el desempeño, LUMA expone que la misma no es ilimitada, pues las citadas

secciones de la Ley 120-2018 así lo demuestran. Por consiguiente, le atribuye al Negociado el interferir material e ilícitamente con sus derechos contractuales, menoscabándolos sustancialmente.

En oposición a los argumentos traídos por LUMA, LECO afirma que la autoridad del NEPR es indiscutible, pues por disposición legislativa se le delegó al Negociado una serie de poderes para alcanzar los objetivos de la política pública energética de Puerto Rico; entre ellos, el regular las compañías de electricidad como LUMA. Añade, que las disposiciones legales relativas al Negociado permiten apreciar que es responsabilidad exclusiva del NEPR establecer el esquema de métricas de desempeño.

De otra parte, si bien admite que en nuestro ordenamiento jurídico lo pactado en los contratos tiene fuerza de ley entre las partes, a su vez asevera que la libertad para entrar en contratos no es una irrestricta, siendo sus frenos la ley, la moral y el orden público. Más aun, LECO expone que el propio Contrato reconoce la autoridad legal del NEPR para modificar las métricas, puesto que en la Sección 4.2(f) y 20.17 del documento se resalta y alerta que el andamiaje de las métricas presentadas por LUMA son ilustrativas y que han de ser revisadas y reemplazadas según necesario.

Por otro lado, LECO rechaza vehementemente que el certificado que el NEPR emitió en su momento referente al contrato tenga el efecto reclamado por LUMA de impedir la modificación de métricas. Asimismo, refuta la limitación pretendida por la parte apelante a algunas de las modificaciones realizadas bajo el argumento de que las áreas de desempeño modificadas[11] no se habían sometido ante la consideración del NEPR; niega que esta no pueda utilizar información actualizada, tal como LUMA ha hecho en su propia propuesta y desmiente que a LUMA se le haya violentado el debido proceso de ley.

---

[11] Estas áreas tratan sobre (1) interconexión para la integración de energía renovable; (2) eficiencia energética y respuesta a demanda energética; y (3) manejo de vegetación.

El NEPR compareció a defender su actuación. Al así hacer, negó los errores señalados por LUMA en su recurso. En primer lugar, defendió la autoridad legal concedida por las distintas leyes arriba citadas para: (1) establecer e implementar los reglamentos y la acciones necesarias para garantizar la capacidad, confiabilidad, seguridad, eficiencia y razonabilidad en las tarifas del sistema eléctrico de Puerto Rico, (2) establecer las guías, estándares, prácticas y procesos a seguir por los entes regulados, y (3) fiscalizar la calidad, eficiencia y confiabilidad del servicio eléctrico provisto por cualquier compañía de servicio eléctrico certificada en Puerto  Rico, de forma que pueda garantizársele una red eléctrica robusta que atienda las necesidades de la Isla. En virtud de la autoridad legal que discutió, rechazó cualquier imputación levantada por LUMA en la que le atribuye interferir con el Contrato. Igualmente, y basándose en las mismas disposiciones legales, negó haberse excedido de la autoridad que estas le reconocen.

De igual forma, el NEPR afirmó en su escrito que, entre las facultades concedidas a este por la Ley 17-2019, está el establecer los mecanismos de incentivos y penalidades basado en el desempeño de las compañías de servicio eléctrico; LUMA incluida. Aunque reconoció que el Negociado dará consideración a lo que una compañía de servicio eléctrico como LUMA proponga, así como a los comentarios que las partes interesadas sometan, estableció que ese hecho, "no altera la estructura del procedimiento, que dispone que es el Negociado de Energía [] quien tiene autoridad exclusiva para determinar los mecanismos de incentivos basado en desempeño."

En cuanto a estos mecanismos, el NEPR aclaró que conforme el propio Contrato establece en su Sección 4(f), el mecanismo de incentivo basado en desempeño propuesto por LUMA es una guía ilustrativa cuya función es servir de guía o ejemplo, sujeto a revisión, discusión y modificación, según sea necesario para alinearse con el marco regulatorio

aplicable. A su vez, el NEPR defendió la utilización de metodologías alternas en la evaluación y aprobación de los mecanismos de incentivos. Particularmente, señaló que la discusión ofrecida por LUMA en su recurso de revisión resulta en confundir el rol que el Negociado ejerce en el procedimiento para establecer estos mecanismos.

A tales efectos, resaltó que contrario a lo que pareció entender LUMA, el NEPR no es parte en el caso, sino que es el ente independiente y experto en tomar la determinación final sobre los mecanismos de incentivo basados en desempeño. Por la señalada razón, asevera no estar obligado a presentar prueba documental o testigos, ni a participar del descubrimiento de prueba como erróneamente LUMA indica.

Por otro lado, el NEPR reclamó que, aunque como norma general las Reglas de Evidencia no aplican a los procedimientos administrativos, tenía la potestad y discreción de utilizarlas para tomar conocimiento judicial de información actualizada con posterioridad a la vista administrativa sobre el desempeño actual de LUMA. Específicamente, y sobre el asunto, ripostó de la siguiente manera:

> Si bien LUMA expresa desacuerdo ante este Honorable Tribunal con el uso de la información sobre la cual el Negociado [de] Energía tomó conocimiento oficial, no argumenta aquí los fundamentos legales por los cuales no procedía tomar conocimiento oficial de dicha información. Ante ello, la procedencia de la toma de conocimiento oficial no es una controversia que este Honorable Tribunal tenga ante sí. Sin embargo, es menester mencionar que el Negociado de Energía, aunque no venía obligado a aplicar las Reglas de Evidencia en el procedimiento que conducía ante sí, las aplicó al momento de tomar conocimiento oficial de la información a la que alude LUMA. El Negociado de Energía estableció con especificidad cada uno de los documentos y datos sobre los cuales se estaría tomando conocimiento oficial, los cuales LUMA no argumenta no son susceptibles de corroboración inmediata y exacta a través de fuentes cuya precisión no pueda ser razonablemente cuestionada. Esto, pues se trata de información que LUMA misma sometió ante el Negociado de Energía en otros procedimientos administrativos. Es decir, objetar los datos sobre los niveles base de desempeño (*baselines*) de LUMA para los años fiscales en cuestión implicaría que [] LUMA hizo una representación incorrecta al Negociado de Energía sobre los referidos datos.

> De la misma forma, el Negociado aseveró que la metodología alterna utilizada para modificar los objetivos de desempeño (*targets*) propuestos

por LUMA; la modificación de los niveles de incentivos (*tiers*) sobre las métricas MOE; el uso de una función lineal para determinar los niveles de incentivos aplicables a LUMA; y su determinación de modificar los puntos base asignados a algunas de las métricas de desempeño, son decisiones sustentadas con evidencia sustancial contenida en el expediente administrativo. Procedió entonces a discutir las razones por las cuales, para cada uno de estos casos, la decisión alcanzada fue correcta.

Así, por ejemplo, reiteró que, como agencia con peritaje sobre los asuntos en controversia, el NEPR no está obligado a otorgar validez a documentos, testimonios, propuestas o explicaciones solo porque no hayan sido controvertidos cuando, entre otras circunstancias, la metodología propuesta resulta incorrecta, inaceptable o contraria al interés público. También contendió varias veces que los argumentos sometidos por LUMA ignoraban completamente la discusión específica y detallada que se incluyó tanto en la resolución final, como aquella emitida en reconsideración y la explicó.

Por último, el NEPR negó que las determinaciones emitidas en el caso sean arbitrarias o caprichosas, el haber actuado fuera de los parámetros que la ley le establece o haber intervenido con el contrato entre las partes. Según reiteró en su escrito, el Negociado es la agencia con competencia exclusiva para evaluar, aprobar, rechazar o modificar los mecanismos de incentivos basados en desempeño y aquellos mecanismos incluidos en el Contrato, son meramente una guía ilustrativa que debe ser evaluado- como se hizo en el caso- por el Negociado.

Hemos considerado todos y cada uno de los argumentos levantados por las partes en el recurso **KLRA202400375,** tanto para impugnar la determinación administrativa alcanzada por el NEPR, así como para defenderla. Ahora bien, si resolviéramos que LUMA tiene razón y la determinación emitida por el NEPR se hizo en exceso de la autoridad

brindada al Negociado por las leyes, procedería declarar nulo lo hecho. Por esta razón, invertiremos la discusión de los errores señalados por LUMA y atenderemos en primera instancia el segundo de estos.

Como arriba consignamos, en su segundo señalamiento de error LUMA asevera que la determinación emitida por el NEPR excede los poderes y la autoridad que la Ley le reconoce y concede a dicho organismo administrativo. En apoyo a esta contención, al discutir este error en síntesis presenta dos argumentos. <u>Primero</u>, al citar las secciones 3 y 8(d) de la Ley 120-2018, expone que las mismas prohíben que el NEPR altere o enmiende el Contrato o que interfiera con asuntos operacionales o contractuales. <u>Segundo</u>, reclama que durante el proceso administrativo el Negociado certificó que el Contrato en cuestión cumplía con las leyes y políticas públicas del Gobierno de Puerto Rico sobre energía. Ante tal certificación, LUMA arguye que el NEPR actuó contrario a sus propios actos. Basándose en esto, reclama que el Negociado se excedió al apartarse de las métricas de incentivo por desempeño que propuso y modificarlas, pues estas formaban parte del Contrato; el cual no tenía autoridad para modificar y con el cual no podía intervenir. No es correcto.

En lo pertinente, la Sección 3 de la Ley 120-2018, mejor conocida como la Ley para Transformar el Sistema Eléctrico de Puerto Rico, lee como a continuación se transcribe:

> **Sección 3. — Intención Legislativa y Declaración de Política Pública.** (22 L.P.R.A. § 1113)
>
> La Autoridad de Energía Eléctrica es una criatura legal de la Asamblea Legislativa de Puerto Rico por virtud de la Ley Núm. 83 de 2 de mayo de 1941, según enmendada, con existencia y personalidad legal separada y aparte del Gobierno de Puerto Rico. Su creación, existencia, facultades, deberes y actividades como negocio público son delegaciones por vía legislativa. Sus activos y franquicias son propiedades del Pueblo de Puerto Rico, su Gobierno y administrados por esa corporación pública, precisamente, por delegación de la Asamblea Legislativa.
>
> Ninguna ley o reglamento podrán ser utilizados o interpretados en contraposición a las disposiciones de esta Ley, excepto por enmiendas en la misma.

**Consignamos, además, que los Contratos de Alianzas y Contratos de Venta que surjan de esta Ley estarán revestidos y protegidos con la máxima consideración de nuestro ordenamiento constitucional en lo relacionado con el disfrute de la propiedad, el debido proceso de ley y la no aprobación de leyes que menoscaben las obligaciones contractuales legítimamente pactadas.**

[…]

Por su parte, la Sección 8(d) del mismo estatuto, lee:

(d) Tras la consumación de cualquier Transacción de la AEE, la Comisión asistirá a la Autoridad en la supervisión del desempeño y cumplimiento del Contratante bajo cada Contrato de Alianza o Contrato de Venta, conforme al Artículo 10(d) de la Ley 29-2009. **La Comisión no tendrá autoridad para alterar o enmendar el Contrato de Alianza o el Contrato de Venta y no interferirá con asuntos operacionales o contractuales, excepto según se dispone en el inciso (f) de esta Sección.** La Autoridad, la AEE y la Comisión deberán preparar en conjunto un plan de trabajo para la supervisión de cada Contrato de Alianza, con el propósito de cumplir con lo dispuesto en el Artículo 10(d) de la Ley 29-2009 y asegurar el uso óptimo de los recursos de cada entidad.[12]

Como puede apreciarse de las porciones transcritas, específicamente del texto destacado, la Ley 120-2018 le concedió a los Contratos de Alianzas y Contratos de Venta, "la máxima consideración de nuestro ordenamiento constitucional", sobre el derecho de las partes involucradas al disfrute de la propiedad y el debido proceso de ley. También, claramente rechaza la aprobación de leyes que menoscaben tales acuerdos. Más aún, es fácil apreciar que, en su octava sección, al establecerse la jurisdicción de la Comisión de Energía en la Ley 120-2018, expresamente se dispuso que este cuerpo no podría enmendar el Contrato de Venta, ni interferir con los asuntos operaciones o contractuales. Empero, y en cuanto a lo último, advertimos que las limitaciones allí establecidas permiten excepciones.

Así pues, el inciso (f) de la Sección 8 de la Ley 120-2018, dice:

(f) Un Contratante bajo un Contrato de Alianza o Contrato de Venta otorgado con respecto a una Transacción de la AEE tendrá la facultad para cobrar derechos, rentas, tarifas y cualquier otro tipo de cargo por la prestación del Servicio o Función, o la construcción, reparación, mejora y el uso de las Instalaciones u otros Activos de la AEE, de conformidad con las disposiciones del Contrato de Alianza o Contrato de Venta. **La Comisión retendrá su jurisdicción bajo las disposiciones de la Ley 83 o leyes especiales pertinentes, para revisar y aprobar cualquier modificación de tales derechos, rentas, tarifas o cualquier otro tipo de cargo.** El Contratante y la

---

[12] 22 LPRA, Sec. 1118(d)

AEE tendrán que cumplir con los requisitos impuestos a la AEE o cualquier otra Compañía de Energía (según definido en la Ley 57-2014, según enmendada, conocida como la "Ley de Transformación y ALIVIO Energético") bajo las disposiciones de la Ley 83, o leyes especiales pertinentes para incrementar o reducir dichos derechos, rentas, tarifas o cargos. **El Contratante y la AEE también tendrán que cumplir con las disposiciones sobre procedimientos de cambios en los derechos, rentas, tarifas y cualquier otro tipo de cargo que serán incluidas en el Contrato de Alianza o Contrato de Venta, disponiéndose que lo anterior no autoriza menoscabar mediante un Contrato de Alianza o Contrato de Venta las facultades y deberes aplicables de la Comisión bajo las leyes especiales pertinentes para incrementar o reducir dichos derechos, rentas, tarifas o cargos.** La Comisión deberá asegurar que toda modificación resulte en que los derechos, rentas, tarifas y cualquier otro tipo de cargo cobrados por un Contratante bajo un Contrato de Alianza o Contrato de Venta otorgado con respecto a una Transacción de la AEE sean justos y razonables y consistente con prácticas fiscales y operacionales acertadas que proporcionen un servicio confiable, al menor costo razonable. (énfasis suplido)

Una evaluación integral de los pedazos antes transcritos, así como el resto de las disposiciones legales citadas en el segundo acápite de esta *Sentencia*, nos mueve a concluir que la limitación impuesta en la Sección 8, inciso (d) de la Ley 120-2018 no tiene la extensión pretendida por LUMA. Explicamos.

Sabido es que las disposiciones de una ley no deben ser interpretadas aisladamente, sino que, al interpretarse el texto de una disposición legal, tal análisis deberá efectuarse juntamente con todas las demás que emanen del mismo cuerpo. Además, los tribunales debemos armonizar, en la medida posible, todas las disposiciones pertinentes en aras de obtener un resultado sensato, lógico y razonable. También, deberán examinar e interpretar las disposiciones legales de modo que no conduzcan a resultados irrazonables o insostenibles, ni a conclusiones absurdas.[13]

Es precisamente con el fin de evitar esto último que diferimos de la interpretación propuesta por LUMA. Tal proposición es incongruente con los amplios poderes que tanto la Ley 54-2014, como la Ley 157-2019 le conceden al Negociado de Energía sobre la política pública energética de

---

[13] Com. Elect. PPD v. CEE et al., 205 DPR 724 (2020)

nuestro País.[14] Entre estos poderes, no albergamos duda, incluye el que es el NEPR la entidad autorizada en ley para **establecer** los mecanismos de incentivos basados en desempeño establecidos en el Contrato. De igual forma, la interpretación brindada por LUMA de las disposiciones de la Ley 120-2018- con el propósito de despachar cualquier autoridad reconocida al Negociado por la Ley 54-2014 y la Ley 157-2019- ignoran y son contrarias a la Sección 20.17 del Contrato. Esta lee como a continuación se transcribe:

> Section 20.17 PREB Authority. Notwithstanding anything to the contrary herein, no provision of this Agreement shall be interpreted, construed or deemed to limit, restrict, supersede, supplant or otherwise affect, in each case in any way, the rights, responsibilities or authority granted to PREB under Applicable LAW with respect to the T&D System, Owner or Operator.

Igual de ilógicos encontramos los planteamientos levantados por LUMA con el fin de aseverar que cualquier autoridad del NEPR para modificar los mecanismos de incentivos del Contrato fue renunciada cuando durante el proceso certificó que dicho documento cumplía con la ley. El expediente administrativo, cuando se analiza al amparo de las distintas leyes que regulan los asuntos en controversia, no admite alcanzar tan irracional conclusión. De los estatutos citados en esta *Sentencia*, la autoridad que el NEPR tiene para revisar, modificar y establecer todo lo concerniente a los mecanismos de incentivo por desempeño a los que las compañías de energía eléctrica como LUMA pueden tener derecho es clara e incuestionable. **Ante el indiscutible texto de estas leyes sobre este asunto, la inmunidad que LUMA argumenta le brinda el Contrato frente a la fiscalización a la cual debe estar sujeta, raya en lo absurdo.**

En consecuencia, resolvemos que, contrario a lo alegado por LUMA, el Negociado actuó dentro de los parámetros de la autoridad que le fue concedida. Siendo ello así, no se cometió el segundo error señalado por LUMA en el recurso **KLRA202400375**. Resuelto esto, evaluamos si la

---

[14] Esto incluye aquellas porciones de las mencionadas leyes que citamos en esta *Sentencia*, así como aquellas contenidas en la ley no específicamente citadas.

decisión administrativa recurrida se emitió en violación a las garantías básicas del debido proceso de ley y no está apoyada en evidencia sustancial que surja del expediente administrativo. Tras un minucioso, detenido y ponderado estudio del legajo apelativo, contestamos en la negativa.

En su recurso, y a los fines de evidenciar la violación a los principios básicos del debido proceso de ley, según ya lo hemos hecho constar previamente en esta *Sentencia*,[15] LUMA argumentó que la determinación emitida por el Negociado era arbitraria e irrazonable, pues no descansó en el contenido del expediente administrativo, si no en prueba ajena al caso. Amparándose en tales planteamientos, reclama que no debemos otorgar la deferencia que como regla general se aplica a las decisiones administrativas. No tiene razón.

En primer lugar, la clasificación de foránea y sorpresiva hecha por LUMA en cuanto a que, parte de la prueba e información que el NEPR utilizó para resolver el caso, descansa en la premisa errónea de que el Negociado tenía un deber de anunciar evidencia, previo a celebrarse la audiencia administrativa y yace del equivocado entendido de que la agencia era parte activa litigante, obligada a descubrir prueba. Como correctamente expuso el NEPR en su oposición al recurso de revisión judicial, "[e]l Negociado de Energía no es parte en este caso, sino que funge como el ente independiente y experto, encargado de tomar la determinación final. Como tal, el Negociado de Energía no está obligado a presentar prueba documental, testigos ni participar del descubrimiento de prueba, ya que su función es la de evaluar la totalidad de la evidencia contenida en el expediente administrativo y, en base a ello y al derecho aplicable, aprobar, denegar, o modificar los mecanismos de incentivos basados en desempeño propuestos por LUMA."[16]

---

[15] Véase páginas 15 y 16 de esta *Sentencia*.
[16] Similar argumento adecuadamente expone LECO en su comparecencia.

Contrario a lo señalado por LUMA, el día antes de la audiencia administrativa el Negociado no anunció sorpresivamente prueba documental a ser utilizada en su contra. El NEPR lo que hizo fue adelantar a LUMA y partes interventoras aquellos documentos que sus consultores y Comisionados podrían utilizar durante los interrogatorios a llevarse. Este hecho fue aclarado por el Negociado, al explicarles que contrario a las partes, no estaba limitado ni obligado por orden que al respecto se hubiera emitido, sobre la información que podría utilizar durante la audiencia.[17]

Segundo, los planteamientos que LUMA levanta en contra de la toma de conocimiento oficial efectuada por el NEPR en el caso pasan por alto el que, si bien la exclusividad del expediente es un principio fundamental en el derecho administrativo, entre las pocas excepciones a esta norma está la facultad que por ley se le ha conferido a los foros administrativos de tomar conocimiento oficial de todo aquello que pudiera ser objeto de conocimiento judicial en los tribunales de justicia.[18] Obvian también, que desde al menos el año 1969, en nuestro ordenamiento jurídico se ha reconocido que, entre aquellas cosas sobre las que una agencia administrativa puede tomar conocimiento oficial, están sus propios récords.[19] No olvidemos que contrario a lo que parece sugerir el escrito de LUMA, la información sobre la cual se tomó conocimiento oficial después de celebrarse la audiencia es data producida por ella misma en otros procedimientos que se celebran ante el Negociado. Por consiguiente, no se trata de información obtenida mediante una investigación posterior

---

[17] Véase, página TA 4265 del Apéndice del recurso **KLRA202400375**. Allí, y en el documento titulado *Resolution and Order* del 10 de enero de 2023, el Negociado expresó lo siguiente: Further, the Energy Bureau **CLARIFIES** that, for regulatory matters, the Energy Bureau is not bound or limited by the T&D OMA, as established in its Section 20.17. Neither is the Energy Bureau bound or limited by any of its orders applicable to the parties, including the intervenors, regarding the permissible scope on any Requirements of Information it may issue to further obtain a comprehensive and thorough administrative file.

[18] Así pues, sobre los asuntos que los tribunales pueden tomar conocimiento, la Regla 201 de Evidencia, 32 LPRA Ap. VI, están los hechos adjudicativos que no están sujetos a controversia razonable porque son susceptibles de corroboración inmediata y exacta mediante fuentes cuya exactitud no puede ser razonablemente cuestionada.

[19] 3 LPRA, Sec. 9653(d); López y otros v. Asoc. De Taxis de Cayey, 142 DPR 109 (1996)

efectuada por la agencia, de una recomendación ex parte recibida con posterioridad a la vista tras haberse efectuado una consulta, ni tampoco de evidencia obtenida al realizarse entrevistas a terceros mientras se espera por la adjudicación que sea ajena al expediente y específicamente.

Tercero, distinto a lo que LUMA señala, en la adopción por parte del Negociado de unas metodologías distintas no se guardó silencio en cuanto a qué evidencia y criterios la motivaron. Tanto en el dictamen original, así como en aquel mediante el cual atendió las reconsideraciones sometidas, quedaron explicadas las distintas razones por las cuales el Negociado utilizó la metodología escogida. También se destacó que el apoyo principal para los métodos fue provisto por LUMA y el Contrato.[20]

Por último, ninguno de los planteamientos levantados por LUMA en ataque a la adopción de objetivos de desempeño diferentes y a los cambios efectuados por el NEPR son suficientes en derecho para derrotar la deferencia que debemos observar hacia las decisiones administrativas. Notamos, que más allá de negar que las determinaciones del Negociado tuvieran señaladas la evidencia en la que se sustentan- por lo que afirma estas carecen apoyo en el expediente- en gran medida se limita sólo a señalar que estas ignoran su propuesta y destacar que la misma no fue impugnada.

En el presente caso, el Negociado tuvo a bien emitir una determinación detallada en la cual explicó cabalmente su análisis y las distintas consideraciones de nuestra política pública energética que guiaron su decisión. También, apuntó a la evidencia considerada para alcanzar sus conclusiones y, en aquellas instancias en las que se apartó de lo propuesto por LUMA, detalló el motivo para tal distanciamiento. Vigente la normativa jurídica establecida por nuestro Tribunal Supremo en cuanto a

---

[20] Véase págs. 7280-7282 del Apéndice del recurso KLRA202400375. Véase también páginas 7605-7606 del mismo apéndice.

que las decisiones administrativas tienen a su favor una presunción de regularidad y corrección, que descansa en la experiencia particular que tiene sobre el asunto que por disposición de ley regula, no encontramos que los planteamientos sometidos por LUMA la derroten, por lo que no estamos en posición de concluir que procede su revocación.

Similar conclusión alcanzamos frente a los argumentos que LECO levanta en el recurso **KLRA202400377**. En este, a modo de primer señalamiento de error, reclama que la notificación efectuada por el NEPR de su *Resolución* del 14 de junio de 2024 no incluye las advertencias adecuadas sobre el derecho que le cobijaba a las partes de solicitar revisión judicial. Por su parte, en su segundo error señalado, cuestiona que el Negociado no haya incluido en la metodología de incentivos en favor de LUMA, disposiciones similares mediante las cuales se le impusieran penalidades, según autoriza la ley se haga.

En cuanto al primer error señalado, al expresarse sobre el recurso KLRA202400377, LUMA manifiesta coincidir con LECO en su reclamo de una notificación inadecuada por falta de advertencias legales. No obstante, afirma que tal defecto solamente causa que no se haya activado el término que la ley establece para la revisión administrativa y no la nulidad del proceso. El NEPR, por su parte, al comparecer contra este recurso, establece innecesarias las advertencias al atender la reconsideración, puesto que estas fueron dadas cuando se resolvió la controversia. De igual forma, argumenta que, si se determinara que tal aviso debió incluirse, la jurisprudencia vigente no obliga a la desestimación pretendida. Sobre el segundo, tanto LUMA como el Negociado afirman y destacan la discreción que reviste la decisión de incluir penalidades. A su vez cuestionan que los argumentos que levanta LECO son insuficientes en derecho para intervenir con la misma.

Hemos examinado la *Resolución* del 14 de junio de 2024 mediante la cual se atendieron las 2 mociones de reconsideración sometidas ante el Negociado. Observamos, que es correcto el señalamiento hecho por LECO en cuanto a que la misma no contiene apercibimiento alguno en cuanto a su derecho a solicitar la revisión judicial, ni el término disponible con el que cuenta para ello.  Igual de adecuados son sus planteamientos en cuanto a la notificación correcta es una característica imprescindible del debido proceso de ley y no un mero requisito. No obstante, notamos que, pese a la falta de notificación señalada, LECO compareció ante este foro dentro del término establecido en la LPAU. En atención a ello y a que ya ha sido resuelto en innumerables veces que, "habiendo la parte presentado su recurso y ante la ausencia de incuria, el Tribunal de Apelaciones debe resolverlo en los méritos"[21], determinamos que el primer error señalado por LECO en el recurso KLRA202400377, no fue cometido.[22]

De otra parte, y sobre la falta de disposiciones en las que se impongan penalidades, nos parece razonable y adecuada el análisis efectuado por el Negociado para incluir en este momento las disposiciones solicitadas por LECO. Si bien las leyes le autorizan a incluirlas, la realidad es que tal potestad está a su discreción, por lo que resolvemos respetarla. Más cuando, según el propio NEPR señaló al atender la reconsideración que en cuanto a esto levantó LECO,[23] la decisión de no incluir penalidades no impide que, bajo las circunstancias apropiadas y tras seguirse el correspondiente procedimiento, el Negociado pueda aplicarlas más

---

[21] PR Eco Park et al. v. Mun. De Yauco, 202 DPR 525 y casos allí citados.
[22] Si bien la determinación que atendió su reconsideración no incluyó lenguaje alguno relativo al derecho a recurrir en revisión judicial, la resolución original mediante la cual el NEPR resolvió lo relacionado a los mecanismos de incentivos por desempeño sí contenía todas las advertencias relativas al derecho a solicitar reconsideración, el término disponible a las partes para ello, el plazo con el que contaba el Negociado para actuar, cómo debía hacerlo y todo lo concerniente al derecho de las partes a acudir en revisión judicial.
[23] Pág. 7600 del Apéndice del recurso KLRA202400375; pág. 1728 del Apéndice del recurso KLRA2020400377.

adelante. Al final de cuenta, el NEPR retiene la autoridad para así hacerlo y ninguna disposición del Contrato puede establecer lo contrario.

-IV-

Por las consideraciones antes expuestas, confirmamos la decisión administrativa recurrida.

Notifíquese inmediatamente.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones